Ruckdeschel et al., Exrs., *v.* Howell,
Appellant, et al.

Argued January 3, 1940. Before SCHAFFER, C. J.,
MAXEY, DREW, LINN, STERN, BARNES and PATTERSON, JJ.

*J. B. Colahan,* for appellant.

*J. Lawrence Wetherill* and *Arthur S. Roberts,* with them *Francis R. Taylor,* of *Taylor, Hoar & Nicholson,* for appellees.

OPINION BY MR. JUSTICE MAXEY, March 27, 1940:

On August 24, 1937, the Caskin School, a Pennsylvania corporation, executed a promissory note to its own order, in the sum of $8,950 payable 90 days later at the Central-Penn National Bank of Philadelphia. Following the school's endorsement, there appeared in order the following endorsements: Joshua Z. Howell (the appellant here), Paul Loder, Richard J. Hamilton and Fred W. Brill. The last named endorser died on October 23, 1937, and his executors are the plaintiffs below and the appellees here.

On the due date of the note, the bank above named, being the then holder of the note, demanded its payment. This being refused, the note was duly protested and notice thereof given to the endorsers. On May 12, 1938, plaintiffs paid $7,212.85, the balance due being paid by Paul Loder. Plaintiffs then instituted this action for the amount they had paid, alleging liability of defendant as a prior endorser to plaintiffs.

The note in controversy was the last of a series of renewal notes, the original note having been executed in May, 1930, in the sum of $20,000 and payable at the Penn National Bank, which discounted it. Each note bore the same four endorsers, but not in the same order as the note in suit. All the endorsers were gratuitous accommodation endorsers.

On May 15, 1930, as the Caskin School was about to obtain a loan from the Penn National Bank in the amount of $20,000, a written agreement was entered into by the four endorsers above named, as parties of the first part, and these same four persons and eight others, as parties of the second part.

In this agreement the parties of the second part expressed their willingness to guarantee the repayment of the note and stated that they "have asked the parties of the first part to act as their agents in guaranteeing to the Penn National Bank the repayment of the loan." The parties then agree in this contract that the "parties of the first part will guarantee to the Penn National Bank the repayment of the said loan, . . . and will receive from the school an assignment of all the right, title and interest of the school in . . . all contracts for tuitions, fees," etc. The agreement then recites that "in the event all moneys received under such contracts by the parties of the first part are not sufficient to pay off the loan . . . to the Penn National Bank . . ., the parties of the second part do hereby agree to make up any such deficiency and to pay the amount of such deficiency to the parties of the first part upon demand; it being expressly understood and agreed, however, that each party of the second part shall contribute a pro rata share toward the payment of such deficiency and in no such case shall any one of the parties of the second part be required to pay more than is set opposite their respective names immediately following":

There follows the names of all the signers to the agreement and opposite Joshua Z. Howell's name is the amount of $1,666.67, as the limit of his liability to pay. The same amount is set forth after the names of Brill and Loder, as the limits of their respective liabilities.

The Central-Penn National Bank of Philadelphia became in due course the holder of the note and after default in its payment and after payment by Brill's executors, upon demand, of $7,212.85 and by Loder of $1,301.15 (he having previously paid $436 on account of the note) Brill's executors and Loder brought suits by foreign attachment against Howell for the amounts they had paid, alleging liability of the defendant to the plaintiffs, by reason of the fact of his prior endorsement. The suits were consolidated for trial.

The defense set up by Joshua Z. Howell is that by the agreement of May 15, 1930, the four endorsers were "agents for all [the parties] to guarantee unto the Penn-National Bank the payment of the principal amount of said note; that the undertaking of each of the parties thereto was limited in amount, as reference to said agreement will appear. . . . That the order in which their names appear on said note has no legal significance as they did not endorse said note as endorsers in the ordinary legal acceptance of the term, but as guarantors or sureties as indicated by the terms of said agreement, and that their liability toward each other was that of co-sureties. . . . That according to the statement of claim of plaintiffs' testator or his representative paid the sum of $7,212.85; that one-twelfth of said amount would be the sum of $601.07 which the defendant would be obligated to pay unto the plaintiffs' testator, and the sum of $144.76 to Paul Loder, that amount being one-twelfth of $1,737.15, which the said Paul Loder paid into the Bank. . . . Wherefore, the defendant avers that he is only liable unto the plaintiffs in said sum of $601.07 and no other sum and that, upon the payment of said sum, he is entitled to be discharged from all obligations under said agreement."

The trial judge ruled that "each endorser was an accommodation endorser, and, as among themselves, co-sureties; that liability for the payments on the note in question as well as for any payments on prior notes was equal among the four endorsers." When defendant offered in evidence the agreement of May 15, 1930, and objection was made to it, the court said: "The paper is admitted in so far as it relates to the obligations between these four endorsers. We are not concerned about the other people, but for the purpose of showing an agreement between these four [endorsers] and all these people there, I am keeping it out." Counsel then said: "I also offer it for the purpose of showing that the obligation of the first four, that is, the parties of the first part,

was limited each to the sum of $1,666.67." This was objected to and the objection was sustained, the court saying: "That is not the way the court interprets the paper. . . . This case is between certain endorsers. . . . Any agreement that relates between these four endorsers as to the payment of money, that is relevant, but any agreement with relation to other parties is irrelevant, even though their names may appear on that paper which is called an agreement."

Upon the admitted proof that Richard J. Hamilton, one of the four endorsers, is insolvent, the trial judge fixed the liability of the defendant at ⅓rd of the amount contributed by the plaintiff-executors, and upon this basis the verdict for $3,879.82 was directed for the executors and against the defendant; and since the other plaintiff, Paul Loder's contribution was only $1,301.15, and was not more than his proportionate share of the common liability, a verdict was directed for the defendant, Howell. The error assigned goes to the rulings of the trial judge relating to the written agreement of May 15th, 1930, and letters written by other guarantors of this loan limiting the individual liability to each other.*

The court below in its opinion refusing a new trial said: "The important factual situation in the instant case is that there are two separate and distinct obligations undertaken: the joint obligation of the four to the bank on the note, and following after that, some

---

* The agreement set forth as Exhibit "B" and attached to the affidavit of defense does not contain all of the signatures of the persons named in the agreement as parties to it, which latter agreement was offered in evidence as Exhibit "D-1". The facts relating to the signatures on the agreement and to four separate letters of guarantee were not fully developed at the trial of the case apparently because of the ruling of the trial judge in excluding the agreement except for the limited purpose above stated. The omitted signatures on the agreement are those of W. D. McClintock, Jr., J. W. H. Brooks, V. S. Fisher and C. L. Brown. None of these was among the four endorsers of the note in question.

obligation by the guarantors to the endorsers, the shares being specified. These are not to be confused. The latter agreement does not affect the joint obligation of the four to the bank and the mutual obligations amongst themselves in consequence of it. The suit is not on the later agreement, but arises out of the joint obligation of the four to the bank under the note which they endorsed."

The foregoing as a recital of facts is correct but as a statement of law, it is error. These endorsers were, *as to the bank,* jointly and severally liable, and any agreement inter esse could not affect that liability. But their legal obligations one to the other were as they had formally agreed they should be. The plaintiffs are not holders in due course. A holder in due course of a negotiable instrument is entitled to the rights the law declares the instrument creates. The endorsers are powerless to impair *those rights* but they may modify *their reciprocal legal obligations* as they see fit. It is not unusual for parties in certain relationships to each other or to one another to modify by mutual agreement their respective rights and obligations from those implied by law from their relationship. Examples: (1) The rights of spouses in each other's property after the decease of one of them may be varied by their antenuptial agreement, from what the law would otherwise declare it to be. (2) Under the Workmen's Compensation Law, either an employer or an employee may, by complying with a specified procedure, elect not to be bound by certain provisions of that act. (3) Section 68 of the Negotiable Instruments Law (56 PS 159) provides: "As respects one another, indorsers are liable *prima facie* in the order in which they indorse; but evidence is admissible to show that as between or among themselves, they have agreed otherwise. . . ." See *Pender v. Cook,* 300 Pa. 468, 150 A. 892.

In Brannan's Negotiable Instruments Law (Beutel, 6th ed. 1938) 830 ff. there is a full discussion on the

liabilities of the parties and the order of liability of the endorsers. The author says this: "In an action by one indorser against one of two other indorsers, the defendant may show that the indorsements were for accommodation and that it was orally agreed among the indorsers that his liability was in no event to exceed one-third of the amount at any time due on the note. *Shea v. Vahey,* 215 Mass. 80, 102 N. E. 119." In this latter case, Chief Justice RUGG of the Supreme Judicial Court of Massachusetts, said: "There was evidence from which it might have been found that the plaintiff was simply the agent of one of the indorsers of the note in taking up the note after maturity and in bringing this action. The defendant was the first of the four indorsers upon the note. The true relation as between themselves of parties liable on a note may be shown by oral evidence in actions between them to determine their respective obligations. It is only in the absence of proof to the contrary that the law fixes the legal effect of their liability on the instrument in accordance with the order of the signatures. *Enterprise Brewing Co. v. Canning,* 210 Mass. 285, 96 N. E. 673. When an outside agreement is proved the rights of the parties as to each other are fixed in accordance with its terms regardless of the order in which the signatures appear on the note. *Lewis v. Monahan,* 173 Mass. 122, 53 N. E. 150. *There was ample evidence to support a finding that the indorsers, of whom there were three at the outset, agreed,* before signing the original note *that they should share equally* whatever they might be required to pay on it, and *that later when the wife of one of the three signed a renewal of the original note making four indorsers it was agreed that the proportion of liability of the defendant should remain the same.* The jury as shown by the verdict believed that this agreement was made. The plaintiff technically was not entitled to recover on the note. *The action should have been by the indorser who has paid for contribution upon the oral agreement."* (Italics supplied.)

Likewise, in the instant case, by written agreement, the respective obligations of the parties-endorsers' liability on the note were fixed by the parties themselves and "the action should have been by the endorser who has paid, for contribution upon the agreement" and not on the note which he endorsed. The parties themselves having fixed the limit of their contribution in the event they were sued for contribution by the endorser who made good the common obligation to the bank, the law must respect that limitation in this suit to enforce contribution. Any one of those who endorsed the note took the risk of being confronted by the limitation he agreed to and which is now invoked, in the event that he as an endorser responded to the call the bank made upon him for payment of the loan.

The agreement is admissible to prove that the parties themselves altered what, in the absence of such agreement, would be the reciprocal obligations annexed by the Negotiable Instruments Law to the instrument they endorsed. Wigmore on Evidence, Vol. 5 (2d ed.), p. 335, sec. 2443, says: ". . . the largest part of the terms of the obligation of a negotiable instrument is *impliedly annexed to it by the law,* without expression in the document. . . . What is the situation, then, of parties who wish to employ a negotiable instrument for the sake of some one or more specific attributes, but wish also to *modify for their own case some of the other generic consequences ordinarily implied* as a part of the whole? They cannot specify these modifications in the instrument without destroying all its negotiable qualities, including those which they desire to secure. On the other hand, by making no specific modification, they will be fixed with consequences which they do not desire. . . . The law, then, it is plain, has recognized the dilemma. It perceives that parties must constantly wish to employ a negotiable instrument for the sake of one or more of its special attributes while discarding others; it concedes that commercial transactions are variant in their

exigencies, while the normal incidents of a negotiable instrument are fixed; and it does not force parties into the alternative of employing either all or none of them. It therefore concedes that by special agreement the parties may discard or alter a specific implied incident, *so far as its operation would affect themselves."* (Italics supplied for the last eight words.)

The judgment is reversed with a venire.